**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **JOHN POTTER,**<br><br>    **Plaintiff,**<br><br>    vs.<br><br>**BLUE SHIELD OF CALIFORNIA LIFE AND HEALTH INSURANCE COMPANY,**<br><br>    **Defendant.** | **Case No.: SACV 14-0837-DOC (KESx)**<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## I. INTRODUCTION

Following a bench trial in this matter, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

## II. FINDINGS OF FACT

### Background

1. Plaintiff John Potter ("Plaintiff") enrolled in Defendant Blue Shield of California Life and Health Insurance Company's ("Blue Shield" or "Defendant") PPO 25 health plan (the "Plan") through his employer, Hughes Investments. Plaintiff's Opening Brief ("Pl. Op. Br.") (Dkt. 129) at 1.

2. The Plan is an employee welfare benefit plan regulated by the Employee Retirement Income Security Act of 1974 ("ERISA").

3. Plaintiff's dependent son, Nicholas Potter ("Potter"), is also a covered beneficiary under the plan. *Id.*

### Period Covered by Blue Shield

4. Potter was admitted to Innercept, LLC Residential Treatment for Adolescents and Young Adults ("Innercept") on January 17, 2012. Motion to Determine the Administrative Record ("Pl. Admin. Rec.") (Dkt. 121) Ex. 9 at Potter0516.

5. Potter was a resident at Innercept between January 17, 2012 and December 13, 2012. *Id.* Ex. 10 at Potter0523.

6. When he was admitted, Potter was taking Abilify (an antipsychotic medication used to treat depression and bipolar disorder), Zoloft (used to treat depression and stress disorders), and Protonix (used to treat gastroesophogeal disease). *Id.* Ex. 9 at Potter0519.

7. While at Innercept, Potter was treated by psychiatrists Dr. Michael Ullrich and Dr. Tim Stoddard, and received therapy from social worker Rosa Mettler. Blue Shield's Opening Brief ("BS Op. Br.") (Dkt. 117) at 5.

8. In January 2012, Potter ran away from Innercept at least twice. Pl. Op. Br. at 4.

9. A January 26, 2012 drug screen tested positive for alcohol and marijuana. *Id.* at 10; *see* Pl. Admin. Rec. Ex. 8 at Potter0492.

10. On February 1, 2012, Potter ran away from Innercept again. Pl. Op. Br. at 5.

11. A few days later, Potter was hospitalized at Kootenai Behavioral Health. He was released by February 8, 2012. *Id.*; BS Op. Br. at 7.

12. Later in February, Potter and another resident had a physical altercation, which resulted in a call to the police. Pl. Admin. Rec. Ex. 9 at Potter0052

13. In early March 2012, Potter "eloped"—or ran away from—from Innercept again. BS Op. Br. at 8.

14. On March 6, 2012, Dr. Ullrich prescribed lithium (used to treat bipolar disorder and depression) and Klonopin (used to treat panic disorder and anxiety) for Potter. *Id.* at 9.

15. Altogether, Potter ran away from Innercept seven times during the first two months of treatment (*i.e.* in January through March of 2012). *Id.* at 19.

16. In early May 2012, Drs. Ullrich and Stoddard decreased Potter's Zyprexa prescription and increased his lithium prescription. BS Op. Br. at 11.

17. On May 17, 2012, Potter drank alcohol while away from the Innercept facility on a "pass." Pl. Op. Br. at 6; BS Op. Br. at 12; Pl. Admin. Rec. Ex. 6 at Potter0321.

18. On May 29, 2012, Dr. Stoddard decreased Potter's Klonopin prescription. Pl. Admin. Rec. Ex. 8 at Potter0469.

19. Therapist logs from May 30, 2012 state that Potter relapsed two weeks before the log entry (*i.e.* sometime around May 16, 2012), specifically indicating that Potter smoked cigarettes. *Id.* Ex. 6 at Potter0314.

20. On June 5, 2012, Dr. Stoddard decreased Potter's Klonopin prescription again. *Id.* Ex. 8 at Potter0467.

21. On June 7, 2012, Potter ran away from Innercept again. He was not in contact with Innercept or his family until the next day. Pl. Op. Br. at 7. Potter's elopement lasted about five days, and he returned to Innercept on June 13, 2012. *Id.*; BS Op. Br. at 13–14.

22. Blue Shield has covered Potter's treatment for the period described above—specifically, January 17, 2012 to June 30, 2012. Defendant's Administrative Record Ex. D (Dkt. 132-6) (remand decision).

**Period in Dispute**

23. On July 10, 2012, Dr. Stoddard entered an order for Potter to discontinue Klonopin altogether. Pl. Admin. Rec. Ex. 8 at Potter0511.

24. On July 25, 2012, Potter was moved from the Stabilization Program to the Transition Program following a successful overnight visit with his family. Pl. Op. Br. at 7.

25. On August 7, 2012, Dr. Stoddard decreased Potter's Zyprexa prescription again (as described above, Potter's Zyprexa prescription was decreased in early May 2012). Pl. Admin. Rec. Ex. 8 at Potter0507.

26. On September 5, 2012, Dr. Stoddard again decreased Potter's Zyprexa prescription. *Id.* at Potter0490.

27. On September 18, 2012, Dr. Stoddard again decreased Potter's Zyprexa prescription. *Id.* at Potter0503.

28. Potter's September 30, 2012 drug screen was positive for alcohol. Pl. Admin. Rec. Ex. 8 at Potter0491.

29. On October 4, 2012, Potter was told that he tested positive for alcohol. When given the news, he became verbally aggressive. *Id.* Ex. 6 at Potter0244.

30. On November 4, 2012, Potter tested positive for alcohol and illegal substances. *Id.* Ex. 8 at Potter0491.

31. Potter was discharged from Innercept on December 13, 2012. *Id.* Ex. 6 at Potter0204.

32. Upon discharge, Innercept recorded Potter's diagnoses as: (1) Bipolar Disorder Type II, (2) Anxiety Disorder, (3) Polysubstance Dependence, and (4) Attention

Deficient/Hyperactivity Disorder Predominantly Inattentive Type. *Id.* Ex. 10 at Potter0523.

33. There is no record of Potter running away from Innercept between July 1, 2012 and December 13, 2012.

34. Blue Shield has refused to cover Potter's treatment at Innercept for the period between July 1, 2012 and December 13, 2012.

## III. CONCLUSIONS OF LAW

35. Documents filed with this Court bearing the Bates numbers Potter0683–0825 are the operative plan documents. *See* Order, Oct. 14, 2016 (Dkt. 145) at 4 (sealed).

36. The Administrative Record in this case consists of:

    a. BSC00001–00684, 0678–681, 0768–0770, 0771, and 0774–1195;

    b. INNERCEPT00001–0341; and

    c. Potter0001–0977.

    *See id.*

37. The parties have stipulated to a *de novo* standard of review in this case. Order, June 3, 2015 (Dkt. 53). Under *de novo* review, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

38. "[W]hen the court reviews a plan administrator's decision under the *de novo* standard of review, the burden of proof is placed on the claimant." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010) (citing *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)).

**What the Plan Covers**

39. Plaintiff's Plan includes a section entitled "Principal Limitations, Exceptions, Exclusions, and Reductions." Pl. Admin. Rec. Ex. 1 ("Plan Docs") at Potter0765. Under this section, "[u]nless exceptions to the following are specifically made elsewhere in [the Plan], no benefits are provided for the following services . . . :"

      3. for or incident to services rendered in the home or hospitalization or confinement in a health facility primarily for rest, Custodial, Maintenance, Domiciliary Care, or Residential Care except as provided under Hospice Program Benefits (se Hospice Program Benefits for exception); . . .

      6. for substance abuse treatment or rehabilitation on an Inpatient, Partial Hospitalization or Outpatient basis except as specifically listed under Mental Health and Substance Abuse Benefits[.]

*Id.* at Potter0766.

40. Under the "Mental Health and Substance Abuse Benefits" section, "benefits are provided for the following Medically Necessary covered Mental Health and substance abuse Services:"

      1. Inpatient Mental Health Services
      Benefits are provided for psychiatric Inpatient Services in connection with hospitalization for the treatment of mental illness . . . . Residential care is not covered.

      (If inpatient substance abuse treatment, expect for acute medical detoxification, is selected as an optional benefit by your Employer, an accompanying insert provides the benefit description . . . . )

*Id.* at Potter0757.

41. "Inpatient" is defined as "an individual who has been admitted to a Hospital as a registered bed patient and is receiving Services under the direction of a Physician." *Id.* at Potter0787. "Residential care" is defined as "services provided in a facility or a free-standing residential treatment center that provides overnight/extended-stay services for Insured who do not qualify for Acute Care or Skilled Nursing Services." *Id.* at Potter0789.

42. Plaintiff concedes that Potter was not an inpatient.[1] *See* Plaintiff's Responsive Trial Brief ("Pl. Resp. Br.") (Dkt. 142) at 14.

43. The Plan expressly does not cover residential care for either mental health or substance abuse treatment.

44. However, plans within the scope of the California Mental Health Parity Act ("Parity Act") must provide all "medically necessary treatment" for "severe mental illnesses," whether or not that treatment is included in the language of the plan. *Harlick v. Blue Shield of California*, 686 F.3d 699, 710–19 (9th Cir. 2012). Defendant concedes that Plaintiff's plan comes with the scope of the Parity Act. Defendant's Trial Exhibit ("Def. Tr. Ex.") at 2 (filed as attachment to this Order).

45. The Parity Act does not require health insurers to cover substance abuse treatment.

46. Thus, despite its terms, the Plan covers mental health treatment to the extent required by the Parity Act.

47. Accordingly, Plaintiff must show that residential treatment for Potter's bipolar disorder continued to be medically necessary after June 30, 2012.

**Waiver of Reason for Denial**

48. "The general rule . . . is that a court will not allow an ERISA plan administrator to assert a reason for denial of benefits that it had not given during the administrative process." *Harlick*, 686 F.3d at 719–20.

49. Plaintiff argues that Defendant should not be allowed to argue that the Plan does not cover substance abuse treatment, because it never raised this as a reason for denial until its Opening Trial Brief in this case. Pl. Resp. Br. at 11–13.

50. Claim forms submitted by Plaintiff describe Potter's illness as "mental illness-bipolar" and "mental health treatment" and do not mention substance abuse. BSC00005, 00057, 00201, 00327. Plaintiff has presented no evidence that he requested coverage for substance abuse treatment in addition to mental health treatment.

---

[1] Nevertheless, Plaintiff's employer did not purchase the optional "Inpatient substance abuse treatment" benefit. *See* Declaration of Jennifer Garrison ("Garrison Decl.") Exs. A-1, A-2 (Dkts. 132-2, 132-3).

51. Under these circumstances, the Court finds that there is no evidence that Defendant was aware, or should have been aware, during the administrative process that Plaintiff was seeking coverage for substance abuse treatment. Defendant therefore did not waive the argument that the Plan does not cover substance abuse treatment.

**Medical Necessity**

52. The Plan defines "medical necessity" as "includ[ing] only those [Services] which have been established as safe and effective, are furnished under generally accepted professional standards to treat illness, injury or medical condition, and which, as determined by the Plan, are:
    a. Consistent with the Plan's medical policy;
    b. Consistent with the symptoms or diagnosis;
    c. Not furnished primarily for the convenience of the patient, the attending Physician or other provider; and
    d. Furnished at the most appropriate level which can be provided safely and effectively to the patient."

    Plan Docs at Potter0788.

53. In addition, "[i]f there are two or more Medically Necessary services that may be provided . . . Blue Shield Life will provide benefits based on the most cost-effective service." *Id.* Finally, "[t]he Plan reserves the right to review all claims to determine whether Services are Medically Necessary[.]" *Id.*

54. Plaintiff argues that the Plan's definition is the applicable definition of "medically necessary," because "the rights and obligations of the parties to an ERISA plan derive entirely from the plan documents." Pl. Resp. Br. at 2 (citing *CIGNA Corp. v. Amara*, 563 U.S. 421, 436 (2011); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 213 (2004)).

55. The Plan documents—specifically the Group Policy Shield Spectrum PPO Plan—include an integration clause: "This Policy, including appendices, attachments, or other documents incorporated by reference, constitutes the entire agreement between the

parties, and any statement made by the Employer or by any Insured shall, in the absence of fraud, be deemed a representation and not a warranty." Plan Docs at Potter0704.

56. Plaintiff's Certificate of Insurance ("Certificate") is expressly integrated into the Plan. *Id.* at Potter0692. The Certificate does not contain a separate integration clause describing which documents make up the Plan. *See id.* at Potter0711–0801.

57. Accordingly, the terms of the integration clause in paragraph 52, above, control.

58. Defendant "has adopted a medical policy regarding the medical necessity of residential treatment, which is contained in the level of care guidelines." Defendant's Responsive Trial Brief ("Def. Resp. Br.") (Dkt. 143) at 13.

59. Defendant suggests that its level of care guidelines are incorporated by reference into the Plan through language in the Certificate stating that in order for a service to be medically necessary, it must be "consistent with the Plan's medical policy" and "furnished at the most appropriate level." *Id.* at 13; *see* Plan Docs at Potter0788. Defendant argues that Plaintiff is required to show that these guidelines—as opposed to the Plan's definition of "medical necessity"—were satisfied. Def. Resp. Br. at 14.

60. In *Prichard v. Metropolitan Life Ins. Co.*, 783 F.3d 1166, 1170–71 (9th Cir. 2015), the Ninth Circuit was faced with an integration clause that listed the documents included in the plaintiff's plan. *Id.* at 1170. The Court held that

> a Plan document's integration clause, which was plainly intended to keep insureds from binding the administrator to promises made in extraneous documents like the Benefit Summary[, which was not listed in the integration clause], also precluded the administrator from binding insureds to the Summary's discretion-granting clause because what is sauce for the gander must be sauce for the goose.

*Id.* (internal quotation marks and alterations omitted) (citing *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1161 (9th. Cir. 2001)). The Ninth Circuit therefore limited its analysis to the documents listed in the integration clause. *Id.* at 1170–71.

61. Here, the Plan documents before the Court do not include level of care guidelines. However, the integration clause allows for documents to be incorporated by reference.

Plan Docs at Potter0704. Accordingly, the Court will limit its analysis to Plan documents and documents properly incorporated by reference.

62. "Under California law, which governs this dispute, parties to a contract may validly incorporate by reference into their agreement the terms of another document when specific factors are met." *First Nat. Bank of N. California v. St. Paul Mercury Ins. Co.*, 603 F. App'x 597, 598 (9th Cir. 2015) (citing *Avery v. Integrated Healthcare Holdings, Inc.*, 218 Cal. App. 4th 50 (2013)).

> For the terms of one document to be incorporated into another, "the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties."

*Socoloff v. LRN Corp.*, 646 F. App'x 538, 539 (9th Cir. 2016) (quoting *Shaw v. Regents of Univ. of Calif.,* 58 Cal. App. 4th 44, 54 (1997)).

63. Seven guidelines have been brought to the Court's attention. On remand, Potter's case was reviewed by Dr. Michael Millman, Blue Shield's Director of Behavioral Health, and Dr. Barbara Center, an independent reviewer. *See* Def. Tr. Br. at 21.

64. Dr. Center applied:
   a. Magellan's "Residential Treatment, Psychiatric, Adult and Geriatric" guideline, BSC0774–0775, and
   b. Magellan's "Residential Treatment, Substance Use Disorders, Rehabilitation, Adult" guideline, BSC0776–0777.

   Def. Tr. Ex. at 18; *see* Garrison Declaration Ex. F-2 at 769.

65. Defendant asserts that Dr. Millman applied the same guidelines as Dr. Center, but also applied the following other guidelines:
   a. Blue Shield's "Residential Acute Behavioral Health Level of Care, Adult"
   b. Blue Shield's "Residential Acute Behavioral Health Level of Care, Child or Adolescent"
   c. Blue Shield's "Substance-Related Disorders: Residential Care"

      d. Blue Shield's "Substance-Related Disorders, Residential Behavioral Health Level of Care, Child or Adolescent"

      e. Blue Shield's "Bipolar Disorders: Residential Care"

Def. Tr. Ex. at 18.

66. Despite the reviewers' reliance on multiple guidelines, Defendant contends that the only dispositive guidelines are the psychiatric residential treatment guidelines apparently referenced in Defendant's initial denial letter. *Id.* at 19; *see* BSC0278 (referencing the "Blue Shield Life medically necessary criteria for coverage of psychiatric residential treatment"). Defendant suggests that these guidelines are Blue Shield's "Residential Acute Behavioral Health Level of Care, Adult" guidelines. *Id.* at 20; *see* BSC1141–47.

67. None of the guidelines listed above have been incorporated into the Plan by reference. "[A] compilation of secret, internal guidelines not disclosed to the employer or to participants or beneficiaries of the Plan" cannot be dispositive. *Egert v. Connecticut Gen. Life Ins. Co.*, 900 F.2d 1032, 1033–34 (7th Cir. 1990).

68. First, the undefined terms "medical policy" and "most appropriate level" are not "clear and unequivocal references" to a document entitled "Residential Acute Behavioral Health Level of Care, Adult." *Socoloff*, 646 Fed. App'x 538. Further, these terms are not clear and unequivocal references to level of care guidelines more generally, nor do they indicate that such guidelines exist at all.

69. Second, there is no evidence that this reference, such as it is, was called to Plaintiff's attention.

70. Third, there is no evidence that Plaintiff consented to the incorporation of the guidelines by reference.

71. Finally, the Court finds that the contents of the guidelines were not known or easily available to Plaintiff. The guidelines were not included in the Plan documents. *See* Plan Docs. They were not included in the various correspondence sent by Defendant. *See* Defendant's Administrative Record Ex. A-1 (Dkt. 132-2). Defendant's reviewers applied a total of seven different guidelines, only one of which Defendant now argues is

relevant. Def. Tr. Ex. at 18. One reviewer, Dr. Center, did not rely on the "relevant" guideline at all. Defendant's Administrative Record Ex. D (Dkt. 132-6) at BSC00768–70. Finally, Plaintiff was not aware of these guidelines until this litigation. *See* Pl. Resp. Br. at 4.

72. Defendant suggests that Plaintiff was aware of the guidelines because they were referenced in Defendant's initial denial letter. Def. Tr. Ex. at 19; *see* BSC0278 (referencing the "Blue Shield Life medically necessary criteria for coverage of psychiatric residential treatment"). However, the initial denial letter is not a Plan document, and in any event the Court finds this reference manifestly insufficient to incorporate Blue Shield's "Residential Acute Behavioral Health Level of Care, Adult" guideline into the Plan by reference.

73. Accordingly, the Court HOLDS that the applicable definition of "medically necessary" is that found in the Plan documents, specifically at Potter0788.

**Whether Potter's Treatment from July 1, 2012 to December 13, 2012 Was Medically Necessary Under the Plan Definition**

74. To reiterate, the Plan defines "medical necessity" as "includ[ing] only those [Services] which have been established as safe and effective, are furnished under generally accepted professional standards to treat illness, injury or medical condition, and which, as determined by the Plan, are:

   a. Consistent with the Plan's medical policy;
   b. Consistent with the symptoms or diagnosis;
   c. Not furnished primarily for the convenience of the patient, the attending Physician or other provider; and
   d. Furnished at the most appropriate level which can be provided safely and effectively to the patient."

   Plan Docs at Potter0788.

75. First, there is no document in the Plan documents or incorporated by reference that is purports to be a medical policy. Thus, while the Court cannot find that Potter's stay at

Innercept between July 1, 2012 and December 13, 2012 was consistent with the Plan's medical policy, it also cannot find that it was inconsistent with such policy. Accordingly, the factor is met.

76. Second, the Court finds that the residential treatment was consistent with Potter's symptoms and diagnosis. Upon admission to Innercept, Potter was provisionally diagnosed with (1) R/O Bi-Polar Disorder Type II, (2) Anxiety Disorder NOS, (3) Polysubstance Dependence, and (4) Attention-Deficit/Hyperactivity Disorder Predominantly Inattentive Type. Pl. Admin. Rec. Ex. 9 at Potter0521. This diagnosis had not changed at the time Potter was discharged. *Id.* Ex. 10 at Potter0523.

As to his substance abuse problem, Potter relapsed at least twice in the relevant period, testing positive for alcohol on October 4, 2012; for marijuana and "spice" on November 3, 2012; and for alcohol and marijuana on November 4, 2012. *Id.* Ex. 8 at Potter0491.

As to Potter's general symptoms, a review of Potter's Patient Medication Sheets between July 10, 2012 and December 11, 2012 shows that Potter was overall doing well. *See id.* at Potter0493–0512. As Plaintiff points out, Potter's treating physician, Dr. George Ullrich, noted in April that Potter was "at significant risk of relapse into substance abuse, impulsive behavior and unpredictable response to stressors." Pl. Op. Br. at 11 (quoting *id.* at Potter0477). By contrast, the June through December Medication Sheets do not include any similar language. Rather, Potter is described as cooperative, alert, applying for jobs, and generally comfortable with the repeated decreases in his medication. *See* Pl. Admin. Rec. Ex. 8 at Potter0493–0512. In October, staff expressed concern that Potter was reactive and "edgy emotionally." *Id.* at Potter0499. Later that month, Potter was described as having "limited investment in the program . . . not meeting expectations, resistant to redirection, and reactive mood." *Id.* at Potter0497. However, by November 27, 2012, the Medication Sheet was wholly positive, noting that Potter was aware of his risk for future drug use. *Id.* at Potter 0495. Finally, on December 11, 2012, the Medication Sheet included no negative comments.

Potter was "in a stable and positive place emotionally," and discharge was planned for that week. *Id.* at Potter0493.

Based on the above, the Court finds that Potter's treatment at Innercept was consistent with his symptoms and diagnosis. Potter was receiving individual therapy, group therapy, and family therapy. Pl. Op. Br. at 20. He was under the treatment of a psychiatrist who made adjustments to his medication through mid-September 2012. *See* Pl. Admin. Rec. Ex. 8 at Potter0490. Between June 20, 2012 and July 25, 2012, Potter was in Innercept's Intensive program. Pl. Op. Br. at 7. The Intensive program is for young adults who have not developed "the usual coping skills" for making age-appropriate choices. *Id.* at 4 n.7. It includes "comprehensive medical management, individual therapy, group therapy, and twenty-four hour supervision." *Id.* at 4. After July 25, 2012 and until discharge, Potter was in Innercept's Transition program. *Id.*; Pl. Admin. Rec. Ex. 6 at Potter0284. The Transition program includes "medication management, individual and family therapy, as well as twenty-four hour staff availability." Pl. Op. Br. at 7 n.9. These treatments can hardly be said to inconsistent with diagnoses of bipolar disorder, anxiety disorder, attention deficit disorder, and polysubstance abuse. Thus, the Court finds Plaintiff has met his burden on this requirement.

77. Third, the Court finds that Potter's stay at Innercept was not primarily for his or his treating physician's convenience. As Plaintiff points out, Potter did not want to be there. Pl. Resp. Br. at 20. There is no evidence that Potter's stay at Innercept was for anyone's "convenience" at all.

78. However, the Court finds that Plaintiff has not met his burden to prove that Potter's treatment was the most appropriate level which could have been provided safely and effectively to Potter. *See* Plan Docs at Potter0788. "Appropriate" is not defined in the Plan documents. In common parlance, the word means "especially suitable or compatible," or "fitting." *Appropriate*, MERRIAM-WEBSTER DICTIONARY (11th ed. 2009). Thus, the Court must determine whether the residential treatment between July 1,

2012 and December 13, 2012 was the most fitting treatment for Potter during that period.

Potter's medication was decreased or eliminated several times in the period at issue. Potter decreased his use of Zydis in July 2012. Pl. Admin. Rec. Ex. 8 at Potter0511. Also in July 2012, he stopped taking Klonopin for several days, and his physician ordered Klonopin discontinued. *Id.* On August 7, 2012, Potter's physician discontinued his morning does of Zyprexa. *Id.* at Potter0507. Potter's evening Zyprexa was decreased twice, on September 5 and 18, 2012. *Id.* at Potter0490, 0501. No other changes appear to have been made. Upon discharge, Innercept noted that Potter was anticipated to be entering a program "for ongoing support in developing independent skills." *Id.* Ex. 10 at Potter0524. Potter had experienced "long periods of integrity," but was "susceptible to substance use [when] he was experiencing frustration, disappointment, or need for social acceptance." *Id.* at Potter0524. In addition, as opposed to his running away from the program seven times in the first two months at Innercept, there is no evidence that Potter ran away from the program in the period at issue.

In light of these facts, the Court cannot find that twenty-four/seven care in a residential facility was *the most appropriate level* at which care could have been provided to Potter. There seems to be no question that Potter benefitted from the Innercept programs. However, in the five and a half month period between July 1, 2012 and December 13, 2012, Potter's medications were tweaked just four times—and all of the changes were decreases. There is no evidence in the record that suggests that medicine management and therapy could not have been safely and effectively accomplished, for example, on an outpatient basis. Indeed, Potter was enrolled in college courses and occasionally working, indicating that he did not need twenty-four-hour care. *See id.* at Potter0524 ("Nicholas has completed . . . two successful semesters at North Idaho College."); *id.* Ex. 6 at Potter0263 (Potter made "decision to take [a] job . . . and work[ed] 3 times per week[.]").

-15-

79. If more than one "medically necessary" service is available, the Plan states that Defendant will cover "the most cost-effective service." Here, no alternative medically necessary treatment has been presented, and the Court therefore need not determine whether Potter's treatment at Innercept was more cost-effective than some other treatment for the same diagnoses.[2]

80. Because Plaintiff has not met his burden to prove that Potter's residential treatment from July 1, 2012 to December 13, 2012 was the most appropriate level of care that could have been safely and effectively provided to Potter, Plaintiff has failed to show that the treatment was "medically necessary" as defined in the Plan.

81. Accordingly, Potter's residential stay at Innercept between July 1, 2012 and December 13, 2012 was not covered by the Plan.

## IV. CONCLUSION

For the reasons explained above, the Court HOLDS that the plan administrator correctly denied benefits in this case. *See Abatie*, 458 F.3d at 963.

Defendant Blue Shield shall submit a proposed judgment **on or before April 24, 2017**.

DATED: April 7, 2017

*David O. Carter*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

---

[2] Plaintiff moved to supplement the administrative record with invoices from Shoreline Treatment Center, in an effort to show that more expensive treatment options have been covered by Defendant. *See* Motion to Supplement the Administrative Record (Dkt. 122). The Court denied the motion as to these invoices. Order, Oct. 14, 2016 (Dkt. 144). The Court notes that even if these invoices had been allowed into the record, they are irrelevant. Per the terms of the Plan, Blue Shield only chooses the most cost effective service "*[i]f* there are two or more Medically Necessary services that may be provided." Plan Docs at Potter0788 (emphasis added). That is not the case here.